IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RICHARD JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 14-1034-SLR |
| | ) | |
| RORY RUSSELL. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Richard Jackson, Georgetown, Delaware. Pro se Plaintiff.

Kenisha L. Ringgold, Esquire, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: June ⵝ , 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Richard Jackson ("plaintiff"), an inmate at the Sussex Correctional Institution ("SCI"), Georgetown, Delaware, proceeds pro se and has been granted leave to proceed in forma pauperis. He filed this complaint pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc–5. (D.I. 1 at 5) The case proceeds on the amended complaint filed on April 1, 2015, with service on the remaining defendant named therein, Rory Russell ("defendant").[1] (D.I. 20) Presently before the court is defendant's motion for summary judgment. (D.I. 58)

## II. BACKGROUND

In 2005, plaintiff was approached by Charles Saunders, an inmate at SCI, who asked for plaintiff's help taking pictures of inmates as part of the "Chapel Picture Project." (D.I. 62, ex. G at 34-35) Plaintiff met with the chaplain at the time, Larry Lilly, who asked for his help taking pictures and preparing for religious services. (Id. at 35) Plaintiff agreed to help and assisted the chaplain as part of the project. (Id. at 36) However, plaintiff was never officially classified as an employee. (Id., ex. A at 33-34) In 2012, defendant was hired as the SCI chaplain. (D.I. 59, ex. A at ¶ 1) To assist with his duties as chaplain, defendant created a position called the "Nehemiah Chapel

---

[1] In his amended complaint, plaintiff named Dean Blades, James Chandler, Truman Mears, and Perry Phelps as defendants. (D.I. 20) These defendants were withdrawn at request of plaintiff on July 1, 2015. (D.I. 35)

Clerk".[2] (*Id.*, ex. A at ¶ 4) The position involved janitorial and administrative duties, including photographing inmates for the picture project.[3] (*Id.*, ex. E)

Plaintiff alleges that on March 28, 2014, defendant asked him why he did not attend chapel services. (D.I 62, ex. G at 26) Plaintiff alleges when he replied he did not attend because he was a Mormon, defendant responded: "You're one of them, huh. You know what they are about." (*Id.*) Plaintiff responded that he did not want to discuss the matter further. (*Id.*) On April 3, 2014, plaintiff was relieved of his duties as a photographer. (*Id.* at 38) Plaintiff was not officially notified, and instead was informed by another inmate that he would no longer be photographing inmates as part of the project. (*Id.* at 39) Plaintiff used a scheduling book provided by SCI to determine when photographs should be taken. (*Id.*) The book was removed from his possession when he was told he would no longer be taking pictures. (*Id.*)

On April 4, 2014, defendant accepted applications for the "Nehemiah Chapel Clerk" position. (D.I. 59, ex. F) Defendant evaluated applicants based on their answers to four questions, which focused on computer skills and an interest in the position.[4]

---

[2] The name of the position came from the history of the SCI chapel which was built in an initiative called the "Nehemiah Project" and was dedicated as the "Nehemiah Chapel." (*Id.*)
[3] The position duties and responsibilities included: preparing and delivering chapel correspondence, maintaining the chapel calendar, camera duties, setting up the chapel for religious service, librarian duties, maintaining chapel files, operating the PA system for services, transporting chapel mail, and producing chapel material. (D.I. 59, ex. E)
[4] The four interview questions were:
  "(1) Do you have any computer experience? Have you completed the class offered by the education department?
  (2) What is your work history and have you ever been fired from a job?
  (3) Why do you want this job?
  (4) If you and someone else were both qualified for this position why should we pick you?"
(D.I. 59, ex. G)

2

(*Id.*, ex. G) Each question was given three possible points. (*Id.*) No interview questions pertained to an applicant's religion. (*Id.*) Plaintiff did not possess the necessary computer skills and received five points out of a possible twelve, the lowest score out of all applicants. (*Id.*, ex. I) After learning he was not selected for the position, plaintiff filed a grievance which was denied on appeal by the Resident Grievance Committee ("R.G.C.") by a vote of 4-0.[5] (*Id.*, ex. J)

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 475, 586 n. 10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support that assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation

---

[5] The committee stated there was no evidence of staff wrongdoing because there were no questions in the interview that referenced religion. (D.I., ex. J)

3

marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service,* 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV. DISCUSSION

### A. Sovereign Immunity

Plaintiff sues defendant in his individual and official capacities, and seeks punitive damages of $75,000. (D.I. 1 at 1) Plaintiff alleges that defendant denied him equal protection and free exercise of religion in violation of the First and Fourteenth

4

Amendments and the RLUIPA. (D.I. 1 at 5) Specifically, plaintiff alleges that defendant terminated him from his job at the "Nehemiah Picture Project" because he is a Mormon.[6] (*Id.* at 6)

Plaintiff's claim for monetary damages against defendant in his official capacity are in essence claims against the State of Delaware. See *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that a claim against a state official in his or her official capacity for monetary relief is a claim against an official's office, and is a suit against the state). Therefore, these claims are prohibited under the State's Eleventh Amendment immunity. See *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984) ("[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment."); see also *Kentucky v. Graham*, 473 U.S. 159, 167 (1985).

## B. Qualified Immunity

Defendant argues that he is protected by qualified immunity from suits in his individual capacity. The doctrine of qualified immunity serves to protect officers from civil liability "when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223 (2009). Accordingly, it gives "ample room for mistaken judgments." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Qualified immunity prevents a suit against a government official regardless of whether the official makes "a mistake of law, a mistake

---

[6] Plaintiff alleges that his counselor Aleta Jett ("Ms. Jett") told him that he was not given the job because he is a Mormon. (D.I. 62, ex. G at 45) Yet Ms. Jett's testimony expressly contradicts plaintiff's allegations. (D.I. 59, ex. D ¶¶12-13) She states that she expressed disbelief when plaintiff told her that he was not selected for the position because he was a Mormon. (D.I. 59, ex. D ¶ 12)

5

of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal citations omitted).

Whether defendant is entitled to qualified immunity requires a two-step inquiry: whether his acts violated a constitutional or statutory right and, if they did, whether that right was clearly established at the time of the violation. *See Yarris v. County of Delaware*, 465 F.3d 129, 140–41 (3d Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194, (2001), overruled in part by *Pearson*, 555 U.S. at 235). If no constitutional right has been violated, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

The Third Circuit has held that inmates do not have a liberty or property interest in a job assignment that provides Due Process protection. *James v. Quinlan*, 866 F.2d 627, 630 (3d Cir. 1989). Therefore, plaintiff cannot establish that he had a constitutional right to the job because he has no liberty or property interest to the job as an inmate. Even if plaintiff possessed a constitutional right, there is no evidence that defendant violated that right. Defendant chose the most qualified candidate using answers to objective questions in the interview process that related to the position's responsibilities. Plaintiff's lack of computer skills and understanding of the position resulted in a lower score. There is no evidence that defendant's decision not to hire plaintiff for the chapel clerk position was based on plaintiff's religious beliefs. Because there is no violation of a constitutional or statutory right, defendant is protected by qualified immunity which bars plaintiff's claims.[7] Plaintiff's claims under the RLUIPA also fail because the Third

---

[7] Because the doctrines of sovereign and qualified immunity defeat plaintiff's claims, the court declines to address the issues regarding the First or Fourteenth Amendment raised by plaintiff.

6

Circuit has held the RLUIPA does not permit monetary damages against state officials in their individual capacity. *Sharp v. Johnson*, 669 F.3d 144, 154 (3d Cir. 2012).

Plaintiff also alleges that defendant renamed the "Chapel Picture Project" to the "Nehemiah Picture Project" in violation of the Establishment Clause. (D.I. 62 at 4) Defendant alleges that naming the position "Nehemiah Chapel Clerk" was merely an informal reference to the history of the chapel and the position is formally named "Chapel Clerk." (D.I. 63 at 5) The State may not impose a substantial burden on an inmate's free exercise of his or her religion without demonstrating that the practice is reasonably related to a legitimate interest. *Turner v. Safley*, 482 U.S. 78, 89, (1987). The practice must be considered in light of the burden on the inmate and if there are other alternative available at a "de minimis cost". *Id.* Plaintiff has not demonstrated any burden on his religious exercise, therefore, his claim that the project and the position were renamed to express religious preference fails.[8] Plaintiff may still practice his faith without holding the chapel clerk position.

## V. CONCLUSION

For the reasons stated above, defendant's motion for summary judgment (D.I. 58) is granted. An appropriate order shall issue.

---

[8] Another inmate stated that he did not apply for the "Nehemiah Chapel Clerk" position because he was a non-Christian. (D.I. 64 at 3) However, there was no religious requirement for the position, therefore, there was no burden on plaintiff's free exercise of his religion.

7